United States District Court
Southern District of Texas

**ENTERED**

May 22, 2020

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SERGIO ESPINOZA, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:17-CV-3872 |
| | § | |
| MEMORIAL HERMANN MEDICAL | § | |
| GROUP, *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Memorial Hermann Medical Group's and Memorial Hermann Health System's Motion for Summary Judgment. Dkt. 38. Defendants (collectively, "Memorial Hermann") seek dismissal of all of plaintiff Sergio Espinoza's claims, which are for failure to accommodate, harassment, discrimination, and retaliation in violation of the Americans with Disabilities Act; and for interference and retaliation in violation of the Family and Medical Leave Act. After carefully reviewing the motion, response, and reply, the submissions, and the applicable law, summary judgment for Memorial Hermann is **GRANTED IN PART AND DENIED IN PART**.

## I.    Background

Viewed in the light most favorable to Espinoza, unless otherwise noted, the facts are as follows. Memorial Hermann Medical Group, an affiliate of the Memorial Hermann Health System, first hired Espinoza in February 2013 as a "Physician Practice Manager I." Dkt. 49-1 ¶ 1. In that position, he managed all day-to-day operations at an internal medicine facility called the Bellaire Center. Dkt. 49-1 ¶ 1.

Around March 26, 2013, Espinoza was diagnosed with severe rhinitis and conjunctivitis, which required allergen immunotherapy. Dkt. 49-1 ¶ 2. He requested an accommodation of time out of the office twice a week to receive the immunotherapy. Dkt. 49-1 ¶ 2. Matthew French, his supervisor at the time, granted the accommodation. Dkt. 49-1 ¶ 2.

In December 2013, Memorial Hermann offered Espinoza a promotion to "Practice Manager II" (PPM II), which would put Espinoza in charge of managing a cardiology center called Southwest Cardiology. Dkt. 49-1 ¶ 4. The opportunity arose because the former PPM II for Southwest Cardiology, Tiffany Ridley, was promoted to Director of Business Operations. Dkt. 49-1 ¶ 4. When meeting with his superiors to discuss the potential promotion, Espinoza expressed his need for the accommodation to receive immunotherapy. Dkt. 49-1 ¶ 4. Espinoza accepted the offer. Dkt. 49-1 ¶ 4.

At some unidentified time, Espinoza also requested a modified schedule to arrive at work early and leave work early so that he could pick up his daughter from classes, which Ridley agreed to. Dkt. 38-24 at 50–52. In January or February 2014, Espinoza requested a leave of absence to attend counseling after a death in his family. Dkt. 38-24 at 48–49.

When he started using his accommodation to attend medical appointments, Espinoza marked his treatment appointments in a shared calendar, which Ridley could access. Dkt. 49-1 ¶ 6. Ridley repeatedly called him while he was out and asked Espinoza to make up time spent in appointments. Dkt. 49-1 ¶ 6. Ridley also repeatedly assigned Espinoza work while he was out, expecting immediate turn-around, and questioned

Espinoza about when he would make up the time he had missed for his appointments. Dkt. 49-1 ¶¶ 6–7. Espinoza attests that Ridley "belittled" his disability and "spread negative rumors and gossip about [Espinoza] to [his] staff." Dkt. 49-1 ¶ 7. Espinoza attests that he made "numerous attempts to resolve the matter with Ridley directly" before escalating his complaints to Ridley's supervisor. Dkt. 49-1 ¶ 8.

Meanwhile, sometime before September 2014, Ridley issued a performance evaluation for the period July 2013 through June 2014. Dkt. 38-7. Ridley marked Espinoza as "need[ing] improvement" or "not meet[ing] expectations" with regard to several measures of the clinic's financial performance, among other metrics. Dkt. 38 at 5–6; Dkt. 38-7 at 2–4. In her evaluation summary, Ridley stated that she "personally and professionally enjoy[ed] working with" Espinoza, but noted that while Espinoza was "skilled and excel[s] in the technical realm," "most clinic [Key Performance Indicators] still need to improve to meet threshold goals," and that "[it] will take a great amount of dedication and commitment this coming year to meet threshold on [certain] target metrics." Dkt. 38-7 at 12–13.

On March 26, 2015, Ridley issued Espinoza a verbal warning concerning his failure to follow through on work tasks and her difficulty reaching him during office hours. Dkt. 38-21 ¶ 5; Dkt. 38-13. Specifically, Ridley stated Espinoza had "missed deadlines over the last few months on requested information, forgotten to complete or send [her] work like capital requests[,] or not adequately completed requested work like [his] budget." Dkt. 38-13; *see also* Dkt. 38-21 ¶ 5.

In late March, Espinoza raised concerns about Ridley's conduct with Memorial Hermann's human resources department. *See* Dkt. 49-1 ¶¶ 7–9; *see* Dkt. 38-23 ¶ 4; Dkt. 38-15. Around April 15, 2015, Espinoza attended a meeting with Ridley, Espinoza's former supervisor, Matthew French, and a Senior Human Resources Business Partner, Diane Blair. *See* Dkt. 49-1 ¶ 9; Dkt. 38-21 ¶ 6. Ridley attests that she expressed her concerns about Espinoza's performance, including that he was not notifying Ridley of his absences ahead of time and that he was spending too much time visiting other physician groups to build referrals from those practices to Southwest Cardiology. Dkt. 38-21 ¶ 6. Espinoza attests that Ridley "yelled [at] and berated [him]." Dkt. 49-1 ¶ 9.

After the meeting, Espinoza alleges, his "accommodation was taken [] away and [he] was forced into taking intermittent FMLA." Dkt. 49-1 ¶ 9. Memorial Hermann presents Blair's affidavit testimony, which attests that after the meeting Blair suggested Espinoza could apply for FMLA leave. Dkt. 38-23 ¶ 6. Espinoza also testified in deposition that Blair "suggested" he apply for FMLA leave after this meeting. Dkt. 38-24 at 34. It is undisputed that Espinoza ultimately requested FMLA leave to attend medical appointments, where he would be administered immunotherapy shots, for one hour per month between May 11, 2015, and November 10, 2015, and that Memorial Hermann approved the leave. Dkt. 38-24 at 41; Dkt. 49-1 at 21. Ridley also soon after began enforcing a set schedule for Espinoza to be in the office and asked Espinoza to advise her when he arrived at and left the office. Dkt. 49-1 ¶ 10; Dkt. 38-24 at 52–54.

In Espinoza's next performance evaluation for the period July 2014 through June 2015, Ridley cited Espinoza's retention rate among new hires of less than 50% and his

failure to notify her in advance when he would be out of the office. Dkt. 38-9. The net income Espinoza achieved for his practice "[did] not meet expectation" and was "unfavorable to budget due to expenses (salaries)." Dkt. 38-9 at 2.

On August 5, 2015, Ridley issued Espinoza his first written warning. The warning cited Espinoza for inappropriate behavior on July 9, 2015, and for performance errors on July 1, 2015. Dkt. 38-8 at 2. Describing the written warning, Ridley attests that Espinoza "disobeyed [her] instruction not to speak with his staff about upcoming focus groups," which were executed to investigate low "employee engagement scores" among the staff under Espinoza's supervision. Dkt. 38-21 ¶ 8. Ridley attests that she told Espinoza not to speak with the staff about the focus groups before they convened to maintain the integrity of the investigation. Dkt. 38-21 ¶ 8. Several staff members informed Ridley that Espinoza had discussed the focus groups with them beforehand. Dkt. 38-21 ¶ 8. When Ridley confronted Espinoza about the issue, she asserts, Espinoza failed to provide her with a satisfactory explanation for disobeying her instruction, became frustrated with her, and discontinued the discussion. Dkt. 38-21 ¶ 8; *see also* Dkt. 38-17 (meeting invitation to discuss focus group issue). Espinoza disputes that he violated any mandate of Ridley's or company policy, as will be detailed below.

Espinoza was in a motor vehicle accident on August 18, 2015, and he requested leave to attend physical therapy to treat a muscle strain in his neck starting September 10, 2015. Dkt. 38-24 at 41–44. Memorial Hermann granted the request. Dkt. 38-24 at 41–42.

Ridley issued a second written warning, a "Final Written Warning" dated September 4, 2015. Dkt. 38-10; Dkt. 38-21 ¶ 9. Ridley cited Espinoza's inappropriate

behavior and performance errors on September 3, 2015. Dkt. 38-10. The warning discusses "many failures," according to Ridley. Dkt. 38-21 ¶ 9. Those included concerns that:

- Espinoza failed to timely respond to the Information Services Department's multiple email requests to set up trainings for cardiologists. *See also* Dkt. 38-18.

- Espinoza called an employee on her day off to discuss the employee's communications with Ridley as opposed to with Espinoza.

- Espinoza sought letters of recommendation from cardiologists and told them that Memorial Hermann was "pushing him out" of his position.

- Espinoza refused to participate in a discussion about his communications with the focus group in July. Dkt. 38-10 at 3.

Finally, Ridley issued a "corrective action form" on October 16, 2015, laying out several more performance concerns and memorializing the decision to terminate Espinoza's employment. Dkt. 38-11. The form noted physicians' "increased complaints in the last month" regarding Espinoza's failure to complete tasks. *See also* Dkt. 38-21 ¶ 10. These included:

- Espinoza failed to procure supplies that Dr. Jose Soto needed for a nuclear camera.

- Espinoza failed to manage staff resources or allocate staff to assist his patient base, as reported by Dr. David Portugal.

- Espinoza failed to "handle" a contract with Southwest Hospital on behalf of Dr. Vasit.

- Espinoza failed to list a new physician, Dr. Marcin Bujak, on the clinic's Financial Daily Operating Report, despite the fact that Dr. Bujak had arrived at the clinic weeks earlier.

- Espinoza failed to provide Memorial Hermann's business services manager, Virginia Gore, with requested information about a billing issue despite multiple emails to Espinoza about this. The issue resulted in a bill write-off. *See* Dkt. 38-19.

- Espinoza failed to ensure patients were called the day before their appointments, resulting in physician complaints about a significant increase in no-shows.

- Espinoza failed to properly manage staff resources, resulting in Dr. Lubetkin's complaint that staff morale was low, staff were overwhelmed, and staff were making more mistakes than usual.

Espinoza filed this lawsuit on December 23, 2017, raising claims for (1) failure to accommodate his disability, in violation of the Americans with Disabilities Act, (2) discriminatory harassment based on disability, under the ADA, (2) wrongful termination based on his disability, under the ADA, (3) retaliation under the ADA, (3) interference with the right to medical leave under the Family and Medical Leave Act, and (4) wrongful retaliation under the FMLA.

## II.   Applicable Legal Standards

### A. Summary Judgment

In deciding a motion for summary judgment under Federal Rule of Civil Procedure 56, the Court must determine whether the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (citations and internal quotations omitted). In deciding whether a genuine and material fact issue has been created, the Court must review the facts and the inferences to be drawn from those facts

in the light most favorable to the non-movant. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

## III.   Analysis

### A. ADA Failure to Accommodate Claim

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." *Id.* § 12112(b)(5)(A). In other words, "a plaintiff must prove the following statutory elements to prevail in a failure-to-accommodate claim: (1) the plaintiff is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations." *Amedee v. Shell Chem., L.P.*, 953 F.3d 831, 837 (5th Cir. 2020). It is the employee's responsibility to request reasonable accommodations. *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007).

Memorial Hermann argues that Espinoza's failure-to-accommodate claim must be dismissed because Espinoza only requested one accommodation—leave for immunotherapy shots and treatment related to injuries from a motor vehicle accident—

and Memorial Hermann did not fail to provide that accommodation. Dkt. 38 at 12. As to this claim, the Court grants summary judgment for Memorial Hermann.

Espinoza's failure-to-accommodate claim must be dismissed because Espinoza does not pinpoint any request for a reasonable accommodation that was not subsequently accommodated. *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 587 (5th Cir. 2020) (affirming summary judgment on ADA failure-to-accommodate claim where plaintiff "fails to pinpoint any request(s) that were not subsequently accommodated").

Espinoza asserts that after the April 15, 2015 meeting, his accommodation was "taken away" and he was forced instead to take FMLA leave. But he also testified in deposition that he sought FMLA leave because Blair "suggested" it. Dkt. 38-24 at 34. Espinoza does not meaningfully identify the accommodation that was "taken away" or how he was "forced" to take FMLA leave instead. Such "vague, self-serving statements" are "not sufficient to raise a genuine issue of material fact." *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 294 (5th Cir. 2004).

Accordingly, the Court **GRANTS** summary judgment for Memorial Hermann on Espinoza's failure-to-accommodate claim.

### B. ADA Harassment Claim

To succeed on a claim for disability-based harassment under the ADA, the plaintiff must demonstrate (1) that he belongs to a protected group; (2) that he was subjected to unwelcome harassment; (3) that the harassment complained of was based on his disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have

known of the harassment and failed to take prompt, remedial action. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003).

Memorial Hermann argues that summary judgment should be granted as to Espinoza's ADA harassment claim because Espinoza alleges only harassing conduct that is not severe enough to form the basis of an ADA claim. Dkt. 38 at 18–20. As to this claim, the Court grants summary judgment for Memorial Hermann.

 "The legal standard for workplace harassment in this circuit is . . . high. For workplace abuse to rise to the level of an actionable offense the 'disability-based harassment must be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment." *Gowesky*, 321 F.3d at 509. Conduct that is "insensitive and rude," including "harsh words or cold-shouldering," does not necessarily rise to the level of actionable harassment. *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563–64 (5th Cir. 1998); *see also Clark v. Charter Commc'ns, L.L.C.*, 775 F. App'x 764, 768 (5th Cir. 2019).

As relates to his harassment claim, Espinoza testifies by affidavit that when he was out of the office for treatment, Ridley repeatedly called him, once to twice per week. Dkt. 49-1 ¶ 6. She "took issue" with Espinoza's need for allergy treatment, and would ask Espinoza when he was going to make up the time spent in treatment. Dkt. 49-1 ¶ 6. She "belittled" Espinoza's disability and "did not think it was worthy of an accommodation." Dkt. 49-1 ¶ 7. Riley repeatedly assigned Espinoza work while in treatment, with immediate deadlines. Dkt. 49-1 ¶ 7. Riley "spread negative rumors and gossip about [Espinoza] to [his] staff." Dkt. 49-1 ¶ 7. He asserts that during the April 15, 2015 meeting

with Human Resources, Ridley "yelled [at] and berated [him], . . . subjecting [him] to verbal abuse." Dkt. 49-1 ¶ 9.

Under the applicable law and considered against the record as a whole, this conduct is not harassment within the meaning of the ADA, and certainly not harassment that is sufficiently severe or pervasive to create a hostile work environment. *See, e.g.*, *Credeur v. Louisiana Through Office of Attorney Gen.*, 860 F.3d 785, 796 (5th Cir. 2017) (affirming summary judgment for defendant on harassment claim where plaintiff alleged she was required to not work from home, criticized for her work performance, threatened with termination, forced to take leave without pay instead of FMLA, and forced to sign false payroll documents); *see also Clark*, 775 F. App'x at 768–69 (5th Cir. 2019) (affirming summary judgment for defendant on harassment claim where plaintiff complained of supervisor raising his voice and becoming visibly upset, expressing displeasure, of coworkers' snide comments, and of HR's inaction on the alleged remarks).

Accordingly, summary judgment is **GRANTED** for Memorial Hermann on Espinoza's ADA harassment claim.

### C. ADA Discrimination Claim

To establish an ADA discrimination claim, "the employee may either present direct evidence that [he] was discriminated against because of [his] disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Rodriguez v. Eli Lilly & Co.*, 820 F.3d

759, 764 (5th Cir. 2016) (citing *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)).

If, as in this case, there is no direct evidence of discrimination due to disability, under *McDonnell Douglas*, Espinoza must prove (1) he had a disability, (2) he was qualified for the job, and (3) there was a causal connection between an adverse employment action and his disability. *Rodriguez*, 820 F.3d at 765. Once the plaintiff has made this *prima facie* showing of discrimination, a presumption of discrimination arises, and the employer must "articulate a legitimate non-discriminatory reason for the adverse employment action." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 227 (5th Cir. 2015). If the employer provides a legitimate reason, the plaintiff must offer evidence to show that reason was pretext for unlawful discrimination. *Rodriguez*, 820 F.3d at 765.

Memorial Hermann argues, and the Court agrees, that the only alleged "adverse" employment action Memorial Hermann took against Espinoza within the meaning of the ADA was terminating his employment. *See, e.g.*, *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 427 n. 19 (5th Cir. 2017) (describing employer actions that are not "adverse").

Memorial Hermann argues that Espinoza's claim must fail because he cannot show that a similarly situated employee was treated more favorably. Dkt. 38 at 16. The Court disagrees. Plaintiffs alleging discrimination under the ADA must show a "causal nexus" between an adverse employment action and his disability, but that standard does not require the plaintiff to show that he or she was replaced by or treated less favorably than non-disabled employees. *LHC Group*, 773 F.3d at 695 (holding that ADA discrimination claimant must prove "that he was subject to an adverse employment

decision on account of his disability," and rejecting "splinter[ed]" authorities requiring claimant to prove that he or she was replaced by non-disabled person or was treated less favorably than non-disabled employees).

Memorial Hermann does not otherwise dispute that Espinoza has failed to establish a *prima facie* showing of discrimination.

Accordingly, the Court next considers Memorial Hermann's argument that it terminated Espinoza for legitimate, non-discriminatory reasons, and that Espinoza cannot show that the reasons for his termination were pretextual. Dkt. 38 at 17. Memorial Hermann asserts that it has presented a legitimate, non-discriminatory reason for Espinoza's termination: Espinoza's poor performance. Specifically, Memorial Hermann points to three written disciplinary actions during the final three months of Espinoza's employment, which cite the following performance deficiencies (described more fully above):

- Espinoza failed to follow through on work tasks and was difficult to reach during office hours. Dkt. 38-13. Espinoza had "missed deadlines over the last few months on requested information, forgotten to complete or send [Ridley] work like capital requests or not adequately completed requested work like [his] budget." Dkt. 38-13; *see also* Dkt. 38-21 ¶ 5.

- Espinoza's retention rate among new hires was less than 50%. Dkt. 38-9 at 3; Dkt. 38-21 ¶ 7.

- Espinoza failed to notify Ridley in advance when he would be out of the office. Dkt. 38-9 at 8; Dkt. 38-21 ¶ 7.

- The net income Espinoza achieved for his practice "[did] not meet expectation" and was "unfavorable to budget due to expenses (salaries)." Dkt. 38-9 at 2; Dkt. 38-21 ¶ 7.

- Espinoza disobeyed Ridley's instruction not to speak with his staff about upcoming focus groups. Dkt. 38-21 ¶ 8; 38-17 (meeting invitation).

- Espinoza failed to timely respond to the Information Services Department's multiple email requests to set up trainings for cardiologists, called an employee on her day off, told physicians and staff that Memorial Hermann was "pushing him out" of his position, and refused to participate in a discussion about his communications with the focus group in July. Dkt. 38-10; Dkt. 38-21 ¶ 9.

- Espinoza failed to procure supplies that Dr. Soto needed and requested from him for a nuclear camera; failed to manage staff resources or allocate staff to assist his patient base; failed to "handle" a contract with Southwest Hospital on Dr. Vasit's behalf; failed to list a new physician, Dr. Bujak, on the clinic's Financial Daily Operating Report; failed to provide Memorial Hermann's business services manager, Virginia Gore, with requested information about a billing issue (Dkt. 38-19); failed to ensure patients were called the day before their appointments, resulting in physician complaints about a significant increase in no-shows; and failed to properly manage staff resources, according to Dr. Lubetkin. Dkt. 38-11.

By asserting Espinoza was fired based on poor performance and citing specific examples predating the termination decision and known to the decisionmaker at the time of the decision, Memorial Hermann has shifted the burden back to Espinoza. *See Burton*, 798 F.3d at 233 (finding that defendant had shifted burden back to plaintiff by citing specific examples of poor performance).

"To carry this burden, the plaintiff must rebut each nondiscriminatory reason articulated by the employer." *Rodriguez*, 820 F.3d at 765 (ellipses omitted). Espinoza must "produce substantial evidence indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Burton*, 798 F.3d at 233. "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded [jurors] in the exercise of impartial judgment might reach different conclusions." *Id.* "An

explanation is false or unworthy of credence, and thus pretextual, if it is not the real reason for the adverse employment action." *Id.* (internal quotations omitted).

Considering Ridley's written disciplinary actions and Espinoza's proffered evidence that the reasons given in those written actions are pretext for discrimination, the Court finds that Espinoza has raised a genuine issue of fact whether Ridley's cited reasons for terminating Espinoza were pretextual.

With respect to the first disciplinary action, which concerns primarily Espinoza's interactions with focus group participants, Espinoza disputes the nature of his conversation with staff before the focus group. He attests that Ridley did not "explicit[ly] instruct" him not to talk to the employees regarding the evaluations. Dkt. 49-1 ¶ 25. He attests that he did not tell the participants that the focus group was an evaluation of his own performance. Dkt. 49-1 ¶ 25. He attests that he simply told the focus group participants to "just be honest and nothing more." Dkt. 49-1 ¶ 25. He disputes that he told participants that the focus group's purpose was to evaluate his performance. Dkt. 49-1 ¶ 25.

As to the "Final Warning," Espinoza testified in deposition that he did "not recall there being an issue" with the ISD training because "we actually did schedule the training." Dkt. 38-24 at 81. He asserts that Ridley instructed him to call an employee at her home on her day off, and that he disagreed that Ridley would have had a problem with his calling the employee on her day off because it did not violate company policy and because Ridley had herself called him during his time off before. Dkt. 49-1 ¶ 27; Dkt. 38-24 at 84. Espinoza does not dispute that he sought letters of recommendation from the

physicians with whom he worked, but a reasonable factfinder could look askance at Memorial Hermann for offering this as a "legitimate" reason to terminate him. Espinoza testified in deposition that he did not tell staff that Ridley was trying to "push him out." Dkt. 38-24 at 83–84.

As to the incidents cited in Ridley's termination notice, Espinoza disputed that several of the tasks Ridley faulted him for failing to complete were his to complete in the first place. For example, Espinoza testified that he did not recall Dr. Soto needing him to provide any supplies to assist with a nuclear camera and that "[he] [did]n't know what [Ridley] was talking about" because "[t]he office had its own nuclear camera" (Dkt. 38-24 at 87), that he was not responsible for completing the Southwest Hospital contract for Dr. Basit (Dkt. 38-24 at 88), that he had no control over whether Dr. Bujak was listed on the Financial Daily Operating Report (Dkt. 49-1 ¶ 29), and that his failure to resolve a billing issue within a period shorter than 180 days was based only on an arbitrary deadline unilaterally imposed by his superiors. Dkt. 49-1 ¶ 29.

Espinoza has presented evidence disputing the legitimacy of nearly all of Memorial Hermann's proffered reasons to terminate him. While Espinoza does not specifically address every issue listed in the termination notice, some of those unaddressed issues are vaguely described in the termination notice to begin with, and do not conclusively establish legitimate bases for terminating Espinoza. *See, e.g.*, Dkt. 38-11 (citing general complaint about "staff morale"). Viewing the evidence in the light most favorable to Espinoza, a reasonable factfinder could conclude that Memorial Hermann had engaged in a campaign to document deficiencies and thus justify a decision that had

already been made, as Espinoza argues. *See, e.g.*, *Burton*, 798 F.3d at 236 (citing *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 476–77 (5th Cir. 2015).

Espinoza also asserts that criticisms of his performance with regard to financial metrics are unfounded. In evaluations of Espinoza's performance between July 2013 and June 2015, Espinoza received ratings of "does not meet expectations" and "needs improvement" for several financial performance measures. Dkt. 38-7 at 2–3, Dkt. 38-9 at 2–3. Espinoza asserts that Ridley's evaluations of his financial performance are pretext for discrimination because under his management, Espinoza's practice collected the "largest positive monetary variation for collections that Cardiology Southwest had in its history" at that time. Dkt. 49-1 ¶ 14. He also points to a significant increase in income and decrease in expenses. Dkt. 49-1 ¶ 23. His performance evaluation for the period from July 2014 through June 2015 rated his Practice wRVU—a measure of value—as "Outstanding." Dkt. 38-9 at 2. The record before the Court does not disclose precisely the relationship between the financial metrics at issue in Espinoza's evaluation, or their relative importance to Memorial Hermann. Considering this ambiguity, viewing the evidence in the light most favorable to Espinoza, and considering all of the disputed facts as a whole, the Court finds that a genuine issue of fact exists whether Memorial Hermann highlighted certain deficiencies in Espinoza's performance, despite strong performance by other metrics, as a pretext for discrimination.

Finally, Espinoza asserts that he was terminated for discriminatory reasons because Ridley received low evaluation scores from employees under her supervision, but was nonetheless promoted; that Ridley and other Physician Practice Managers were

not required to make up their time when they arrived late or left the office early; and that Ridley sowed dissension among Espinoza's supervisees. Espinoza also attaches several letters of recommendation from physicians and Memorial Hermann employees with whom he had worked and purported financial reports from his time as PPM II. Memorial Hermann objects to the admission of this evidence for summary judgment purposes as hearsay or irrelevant. The Court does not rule on the admissibility of these documents at this stage, but notes that the Court did not rely on them in reaching its decision.

The Court also notes that the parties dispute whether and how often Espinoza was absent from the office or absent without notice. The Court does not consider that factual dispute relevant to this motion because Espinoza was terminated for performance issues, not his alleged absences. *See, e.g.*, *Burton*, 798 F.3d at 234 ("As an initial matter, we discard the reference to [plaintiff]'s attendance; [plaintiff] was not fired for missing work.")

Accordingly, summary judgment for Memorial Hermann as to Espinoza's ADA discrimination claim is **DENIED**.

### D. ADA Retaliation Claim

"To show an unlawful retaliation, a plaintiff must establish a *prima facie* case of (1) engagement in an activity protected by the ADA, (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action. Once the plaintiff has established a *prima facie* case, the defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment action. If such a reason is advanced, the plaintiff must adduce sufficient evidence that the proffered reason is a

pretext for retaliation. Ultimately, the employee must show that 'but for' the protected activity, the adverse employment action would not have occurred." *Nall v. BNSF Railway Co.*, 917 F.3d 335, 348–49 (5th Cir. 2019).

Memorial Hermann argues that Espinoza cannot prevail on his ADA retaliation claim because there is no evidence that Espinoza engaged in any activity protected by the ADA, and because there is no evidence of a causal nexus between an alleged retaliatory action and a legally protected activity.

Espinoza alleges that the protected activity he engaged in was "tak[ing] an accommodation and complaining about the harassment and discrimination that I was subjected to for my disability and accommodation." Dkt. 49 at 13. Memorial Hermann argues that Espinoza has not alleged that he complained about an unlawful employment practice. The Court disagrees and finds that Espinoza has presented evidence that he complained to Memorial Hermann's human resources department that Ridley's calls and "belittling" remarks concerned his disability. *See, e.g.*, Dkt. 39-1 ¶¶ 7–8.

The adverse action Espinoza alleges is "complaints and disciplinary action," such as an evaluation in 2015 of "needs improvement." Dkt. 49 at 13. He also alleges that Ridley retaliated against him by yelling at him and berating him during the April 15, 2015 meeting. Dkt. 49 at 6. Espinoza also asserts that he was discharged in retaliation for protected activity. *See, e.g.*, Dkt. 49-1 ¶ 31.

Other than the termination, these actions are not considered materially adverse employment actions that would dissuade a reasonable worker from making or supporting a charge of discrimination. *See, e.g.*, *Credeur*, 860 F.3d at 798 ("Chastisement by

superiors, however, does not rise to the level of material adversity that distinguishes an adverse employment action from petty slights, minor annoyances, and simple lack of good manners that the Supreme Court has recognized are not actionable retaliatory conduct.") (interior quotations, brackets, and ellipses omitted). To the extent Espinoza asserts that Memorial Hermann retaliated against him by taking actions other than termination, the Court **GRANTS** summary judgment for Memorial Hermann on those claims.

As to the termination, the Court **DENIES** summary judgment for Memorial Hermann. The Court has already denied summary judgment for Memorial Hermann based on the genuine issue of material fact that Espinoza has raised as to pretext. The Court denies summary judgment on this claim based on the same reasoning.

### E.  FMLA Claims

#### i.  Interference

To establish a *prima facie* case of interference under the FMLA, a plaintiff must show (1) he was an eligible employee, (2) his employer was subject to FMLA requirements, (3) he was entitled to leave, (4) he gave proper notice of his intention to take FMLA leave, and (5) his employer denied him the benefits to which he was entitled under the FMLA. *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017). As with the ADA, however, even if the plaintiff makes out a *prima facie* case, he may not overcome a motion for summary judgment if the employer articulates a legitimate non-discriminatory

reason for the employment action at issue. *Id.* To prevail in such a case, the plaintiff must raise an issue of material fact that the employer's proffered reason was pretextual. *Id.*

Memorial Hermann argues that Espinoza's FMLA interference claim must be dismissed because he only alleges phone calls as interference, which do not rise to the level of interference, and because he cannot prove prejudice from any alleged interference. The Court disagrees and denies summary judgment for Memorial Hermann as to this claim.

Espinoza asserts that Ridley interfered with Espinoza's FMLA rights by, among other things, repeatedly assigning work to Espinoza and expecting an immediate turnaround while Espinoza was in treatment. Dkt. 49-1 ¶ 7. Viewing the evidence in the light most favorable to Espinoza, the Court finds that this testimony is sufficient to raise a fact issue whether Memorial Hermann interfered with Espinoza's FMLA rights.

This testimony also relates to prejudice, which Memorial Hermann argues Espinoza cannot show. Viewing the evidence in the light most favorable to Espinoza, a reasonable factfinder could conclude that Espinoza was assigned work while out on FMLA leave with an expected immediate turnaround and was later penalized for failing to meet those deadlines. The Court cannot find that there is no fact issue as to prejudice.

Accordingly, summary judgment on Espinoza's FMLA interference claim is **DENIED**.

### ii. Retaliation

Retaliation claims for exercising FMLA rights are subject to the *McDonnell Douglas* burden-shifting framework. To make a *prima facie* case of retaliatory discharge,

the employee must show that "(1) he engaged in a protected activity, (2) the employer discharged him, and (3) there is a causal link between the protected activity and the discharge." *Amedee v. Shell Chem., L.P.*, 953 F.3d 831, 835 (5th Cir. 2020). "Once an employee propounds a *prima facie* case of interference or retaliation, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* "Thereafter, 'the burden shifts back to the employee to show by a preponderance of the evidence that the employer's articulated reason is a pretext for discrimination." *Id.*

Memorial Hermann argues Espinoza's FMLA retaliation claim must be dismissed because (1) he has not shown a causal link between his request for FMLA leave and his termination, and (2) he has not shown that Memorial Hermann's proffered reasons for his termination were pretextual. The Court denies summary judgment for Memorial Hermann on this claim.

Again, the Court has found that Espinoza has shown a material fact issue exists whether Memorial Hermann's proffered reasons for terminating Espinoza were pretextual. Accordingly, summary judgment for Memorial Hermann on Espinoza's FMLA retaliation claim is also **DENIED.**

## IV.    Conclusion

Memorial Hermann's motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**. Summary judgment for Memorial Hermann as to Espinoza's ADA failure-to-accommodate and harassment claims is **GRANTED**. Summary judgment for Memorial Hermann as to Espinoza's ADA discrimination claim is **DENIED**. As to

Espinoza's claim that Memorial Hermann retaliated against him by terminating him in violation of the ADA, summary judgment is **DENIED**. Summary judgment for Memorial Hermann on Espinoza's FMLA interference and retaliation claims is **DENIED**.

SIGNED at Houston, Texas, this 22nd day of May, 2020.

**GEORGE C. HANKS, JR.**
**UNITED STATES DISTRICT JUDGE**